**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

---

**ORLANDO B. ALVAREZ,**

                                    **Plaintiff,**                    05-CV-00827(Sr)

**v.**

**GLENN S. GOORD, et al.,**

                                    **Defendants.**

---

## DECISION AND ORDER

Pursuant to 28 U.S.C. § 636(c), the parties have consented to the assignment of this case to the undersigned to conduct all proceedings in this case, including the entry of final judgment.  Dkt. #16.


As a threshold matter, the Court notes that in the caption of his complaint, plaintiff named the following four individuals as defendants: Commissioner Glenn S. Goord; Dr. Canfield Wesley; "William J. Hupkins"; and, Lester N. Wright.[1]  According to the docket sheet maintained by the Western District of New York Clerk of Court, defendant Dr. Canfield Wesley was never served with a copy of the Summons and Complaint. Dkt. #7 (Summons returned unexecuted).  Currently before the Court is the defendants' motion for summary judgment.  Dkt. #26.  For the following reasons, defendants' motion for summary judgment is granted.

---

[1] Although not named in the caption, the Court notes that the body of plaintiff's complaint purports to name a fifth defendant, Cheng Yen, a doctor at the Elmira Correctional Facility.  Dkt. #1, p.2.  The Court further notes, however, that a summons was never issued for Cheng Yen.

## PROCEDURAL BACKGROUND

Plaintiff, proceeding *pro se*, commenced this action on or about

November 22, 2005, against Glenn S. Goord, New York State Department of

Correctional Services ("DOCS") Commissioner; Canfield Wesley, Doctor; William J.

Hopkins (incorrectly named in the complaint Hupkins), Deputy Superintendent for

Administrative Services; and, Lester N. Wright M.D., Deputy Commissioner Chief

Medical Officer,  each in their individual and official capacities.  Dkt. #1.  Plaintiff's

complaint alleges that defendants Goord, Hopkins and Wright were deliberately

indifferent to his serious medical needs in violation of the Eighth Amendment to the

United States Constitution.  At all times relevant to the allegations in plaintiff's

complaint, plaintiff was incarcerated at either the Downstate Correctional Facility

("Downstate") or the Elmira Correctional Facility ("Elmira").   In addition to plaintiff's

request for compensatory and punitive damages, plaintiff's complaint also seeks a

declaratory judgment, as well as injunctive relief in the form of receipt of the proper eye

surgery for his right eye.[2]  *Id.*  As noted above, although named as a defendant, Dr.

Canfield Wesley was never served with a copy of the Summons and Complaint and has

never appeared in this action.  Dkt. #7.

Specifically, against defendant Goord, plaintiff alleges that on October 28,

2004, defendant Goord transferred plaintiff from Downstate to Elmira so that plaintiff

could not receive eye surgery.  Thus, plaintiff alleges that defendant Goord interfered

---

[2] As will be discussed in greater detail below, after plaintiff commenced the
instant action, plaintiff received the eye surgery he was requesting.

with plaintiff's right to receive medical treatment, which in turn resulted in further physical and mental injuries to plaintiff. As against defendant Hopkins, plaintiff alleges that from October 28, 2004 to November 14, 2005, defendant Hopkins, the Deputy Superintendent for Administration at Elmira, refused to send plaintiff to the Albany Medical Center to have an eye care specialist perform surgery to correct plaintiff's right eye. As with defendant Goord, plaintiff also alleges that defendant Hopkins interfered with plaintiff's right to receive medical treatment, which in turn resulted in further physical and mental injuries to plaintiff. Finally, as against defendant Wright, plaintiff alleges that Dr. Wright, the Deputy Commissioner and Chief Medical Officer for DOCS, refused to intervene concerning plaintiff's transfer from Downstate to Elmira and further, refused to overturn the medical decisions made by DOCS physicians. Plaintiff also alleges that Dr. Wright interfered with plaintiff's right to receive medical treatment, which in turn resulted in further physical and mental injuries to plaintiff.

       Following discovery, defendants Goord, Hopkins and Wright filed the instant motion for summary judgment on December 12, 2007. Dkt. #26. Thereafter, by letter dated March 3, 2009, plaintiff stated,

> Your Honor, after carefully researching all aspect's [sic] in this case. At this time I will withdraw my petition in this matter due to the fact that I did not write the Superintendent of Elmira Correctional Facility or Central Office Review Committee [sic] to inform them of my situation concerning my grievance in not doing so I fail [sic] to exhaust my administrative remedies. I thank you for your time in this matter.

Dkt. #39.  Based on the foregoing, on May 8, 2008, this Court issued a Text Order

stating "[i]n accordance with plaintiff's letter request dated March 3, 2008, plaintiff's

complaint is withdrawn without prejudice pursuant to Fed. R. Civ. P. 41(a)(2).  The Clerk

of the Court is directed to take the necessary steps to close this file."  Dkt. #40.  Later

the same day, consistent with this Court's Text Order, the Clerk of Court closed the file.

On or about January 29, 2009, this Court received a letter from plaintiff wherein he

stated,

> On March 3, 2008 I wrote the Court's [sic] asking the Courts
> [sic] to allow me to withdraw my pertition [sic] in this matter.
> On 5/8/08 Hon. H. Kenneth Schroeder, Jr allow the
> complaint to be withdraw [sic] without prejudice pursuant to
> Fed.R.Civ.P. 41(a)(2).  After carefully researching and
> looking in to this matter, I ask the Court's [sic] to reinstate
> this complaint.  I thank this Court for its time and effort in this
> matter.

Dkt. #41.  Shortly thereafter, the Court acknowledged receipt of plaintiff's letter and

instructed plaintiff that his letter request to reinstate the complaint was insufficient and

did not constitute a proper motion seeking reinstatement of the complaint.  Dkt. #42.

Thus, the Court gave plaintiff until March 9, 2009 to file a motion, together with a

supporting affidavit and memorandum of law setting forth the factual and legal basis for

the relief sought.  *Id*.  Plaintiff filed his motion seeking reinstatement of the complaint on

March 3, 2009.  Dkt. ##43 and 44.  By Decision and Order filed March 12, 2009, this

Court granted plaintiff's motion to reinstate the complaint and set a briefing schedule for

the defendants' pending motion for summary judgment.  Dkt. #45.  Plaintiff filed his

opposition to the instant motion for summary judgement on April 14, 2009 (Dkt. #46)

and counsel for defendants filed a reply declaration on June 26, 2009 (Dkt. #49).


**FACTUAL BACKGROUND**

On August 19, 2004, plaintiff was received at the Downstate Reception

Center, a temporary placement where he was given an entrance screening exam.  Dkt.

#27, ¶ 1.  As part of the entrance screening exam, plaintiff's vision was tested and it

was discovered that plaintiff had a refractory error and 20/200 vision in his right eye.  *Id*.

On September 20, 2004, plaintiff was "evaluated for an eye evaluation at the Downstate

Eye Clinic."  *Id*. at ¶ 2.  Thereafter, on October 4, 2004, plaintiff was referred to an eye

specialist at Downstate for his refractory error.  *Id*.  On October 20, 2004, plaintiff had

an ophthalmology consultation at Downstate and following his examination, plaintiff was

diagnosed with having a dislocation of his intraocular lens ("IOL").  *Id*. at ¶ 3.  While at

Downstate, a treatment plan was developed to remove the dislocated IOL, to remove

the capsular scar tissue and implant a new IOL.  *Id*.


On October 28, 2004, before any eye surgery could take place, plaintiff

was transferred from the Downstate Reception Center to his permanent placement

within DOCS at Elmira.  *Id*. at ¶ 4.  Following his transfer to Elmira, Drs. Yin and

Canfield, both physicians at Elmira, reviewed plaintiff's medical records and referred

him to a specialist at the Harrison Center, the medical facility to which inmates at Elmira

with eye conditions are referred.  *Id*. at ¶ 5.  Plaintiff was seen on November 30, 2004

by Dr. William Cosman, a State University of New York ophthalmologist at the Harrison Center. *Id*. at ¶ 6. During that examination, plaintiff complained of blurred vision in his right eye. *Id*. Following his examination, Dr. Cosman concurred with the diagnosis of a dislocation of plaintiff's IOL. *Id*. However, Dr. Cosman recommended that a corrective contact lens evaluation be conducted, and scheduled a follow-up with plaintiff in six to eight months and instructed plaintiff to contact his office if he experienced any problems. *Id*. According to Dr. John Alves, the DOCS Medical Director, "[w]hile Dr. Cosman's plan of treatment differed from the plan of treatment recommended by the Ophthalmologist Plaintiff saw on October 24, 2004, at Downstate, it is my understanding that Dr. Cosman's plan of treatment, i.e., providing a patient with corrective contact lenses, is a common and medically appropriate method of treating refractive errors, as the lenses provide the patient with improved vision, minimize pain and are less invasive than corrective surgery." Dkt. #29, ¶ 9. Moreover, Dr. Alves concluded that by recommending corrective contact lenses, Dr. Cosman avoided potential complications from eye surgery. *Id*.

The DOCS physicians followed Dr. Cosman's recommendations and on December 6, 2004, Dr. Yin referred plaintiff to an optometrist for a corrective contact lens evaluation. Dkt. #27, ¶ 7. On December 30, 2004, plaintiff was examined and fitted for contact lenses and those contact lenses were ordered and shipped to the optometry clinic at Walsh Regional Medical Unit, to be dispensed by Dr. Berger. *Id*. at ¶ 8. Plaintiff received the corrective contact lenses on February 14, 2005 with

instructions to return to Dr. Berger if problems arose with the contact lenses, otherwise, plaintiff was to return to Dr. Green, an ophthalmologist at the Harrison Center, for a yearly examination.  *Id*. at ¶ 9.  With the contact lenses, plaintiff's vision improved significantly from 20/200 to 20/80.  *Id*.  Between February 14, 2005 (the date when plaintiff received the corrective contact lenses) and May 31, 2005, plaintiff was seen by the medical staff at Elmira fourteen times for medical conditions/concerns other than vision problems and at no time, did plaintiff complain about his vision.  *Id*. at ¶ 10.

      As a follow-up to his November 30, 2004 appointment with Dr. Cosman at the Harrison Center, plaintiff was again seen by Dr. Cosman on May 31, 2005 with respect to plaintiff's dislocated IOL in his right eye.  *Id*. at ¶ 11.  The follow-up appointment revealed that plaintiff's visual acuity in his right eye remained stable at 20/80.  *Id*.  However, plaintiff's medical records at the Harrison Center revealed that plaintiff was not tolerant of the corrective contact lenses and was unable to wear them. *Id*.  By reason of his intolerance of the corrective contact lenses, the Harrison Center recommended a care plan, including a return visit for repositioning of his IOL in his right eye and a capsulatomy (an incision in the covering of the lens of the eye, usually performed during cataract surgery).  *Id*.  Therefore, DOCS scheduled plaintiff for a follow-up in six to eight months or for a preoperative evaluation for the repositioning of his IOL, whichever occurred first.  *Id*.

On August 4, 2005, plaintiff had a preoperative evaluation at the Harrison Center performed by Dr. Andrew Robinson. *Id*. at ¶ 12. Plaintiff was provided with prescriptions and instructions to commence applying the eye drops on August 8, 2005, three days before surgery. *Id*. Plaintiff's surgery was scheduled for August 10, 2005 at the Madison Irving ambulatory surgery clinic (affiliated with the Harrison Center). *Id*. Although it is unclear from plaintiff's medical records, plaintiff's surgery, scheduled for August 10, 2005, was cancelled. *Id*. at ¶ 13. Defendants submit that because DOCS had been following its customary pre-operative care plan on August 8-9, 2005, plaintiff's surgery was cancelled by the Madison Irving ambulatory surgery clinic. *Id*. Therefore, in keeping with the follow-up care plan put into place on May 31, 2005 by DOCS, plaintiff was seen for a further follow-up at the Harrison Center on January 12, 2006 and surgery was again recommended. *Id*. at ¶ 14. Plaintiff was also seen by a DOCS physician on January 17, 2006 and surgery was scheduled for January 26, 2006. *Id*. at ¶15. The next day, January 18, 2006, plaintiff was seen by DOCS physician Dr. Yin and Dr. Yin "detected an abnormal electrocardiogram." *Id*. at ¶ 15. As a result, Dr. Yin indicated that plaintiff would need cardiac clearance before he could undergo eye surgery. *Id*. Due to the uncertainty of whether plaintiff would be able to be seen by a DOCS physician and receive cardiac clearance before January 26, 2006, plaintiff's eye surgery was placed on hold. *Id*. Plaintiff was seen by a cardiologist on January 23, 2006 and Dr. Patel concluded that plaintiff was "stable for cataract surgery." *Id*.

A further consultation at the Harrison Center was scheduled for February 9, 2006. *Id*. at ¶ 16. At that time, plaintiff was seen by Dr. Petrela and Dr. Petrela did not recommend that plaintiff receive immediate surgery. Rather, Dr. Petrela recommended that plaintiff be re-fitted for corrective contact lenses and Dr. Petrela scheduled plaintiff for a follow-up in three months. *Id*. Plaintiff was next seen at the Harrison Center on May 8, 2006 and Dr. Phung, an ophthalmologist, noted that there was no improvement following the re-fitting of the corrective contact lenses and Dr. Phung recommended corrective eye surgery and noted that the next visit would be a pre-operative visit. *Id*. at ¶ 17. Plaintiff was seen at the Harrison Center for his pre-operative visit on June 5, 2006 and his next scheduled visit would be for his post-operative examination. *Id*. Thereafter, plaintiff's surgery was scheduled for June 28, 2006 and on June 20, 2006, plaintiff completed his pre-operative medical testing and was cleared for surgery. *Id*. Plaintiff's corrective eye surgery was performed by Dr. Petrela at the Harrison Center on June 28, 2006. *Id*. at ¶ 18. Plaintiff's post-operative care was monitored by DOCS physicians and with several additional consultations with ophthalmologists at the Harrison Center. *Id*.

Plaintiff was housed at Elmira for the period October 28, 2004 through May 11, 2007. Dkt. #33, ¶ 3. The Acting Inmate Grievance Program Supervisor at Elmira in or about December 2007, Marty Titus, conducted a search for any inmate grievance filed by the plaintiff while he was housed at Elmira. *Id*. at ¶¶ 1-2. During that time period, plaintiff filed only two grievances, both of which were filed in April 2007. *Id*.

at ¶ 3.  According to Supervisor Titus, neither of the two grievances filed by plaintiff in April 2007 relate in any way to inadequate medical care.  *Id*.  In support of the allegations in his complaint, plaintiff claims that he filed two grievances and plaintiff purports to attach those "grievances" to the complaint.  Dkt. #1.  The two documents were also attached as Exhibits B and C to Marty Titus' declaration filed in support of defendants' motion for summary judgment.  Dkt. #33, pp.6-10.  As set forth in Marty Titus' declaration, the first document that plaintiff claims is a grievance is a letter dated March 18, 2005 and does not reflect to whom or where within Elmira it was sent.  Dkt. #33, ¶ 4.  Following his search of the inmate grievance records, Marty Titus stated in his declaration that the March 18, 2005 handwritten document was not received by the Inmate Grievance Office and therefore, it was not considered filed under DOCS Directive 4040.  *Id*.  The next document that plaintiff claims was submitted as a grievance is dated March 31, 2005 and is addressed to "E.G.P. Supervisor."  In his declaration, Marty Titus states that he is "unsure to what that refers."  *Id*.  However, to the extent that plaintiff claims that he submitted a grievance and did not receive a response, "such non-response is considered a denial of his grievance, and he is obligated to appeal to the Superintendent under Directive 4040 in order to exhaust his administrative remedies.  Moreover, if he had done so, such letter would be included in his grievance file in the grievance office, and there is no such letter here."  *Id*.

    As will be discussed in greater detail below, defendant Glenn S. Goord submits that he had no personal involvement concerning the decision to transfer plaintiff from Downstate to Elmira.  Dkt. #30, ¶ 3.  Indeed, defendant Goord states, "I

had no involvement regarding the routine transfer of inmates from one facility to another, as DOCS' Office of Classification and Movement is responsible for making such decisions." *Id*. As noted above, in his complaint, plaintiff alleges that defendant Hopkins refused to send plaintiff to the Albany Medical Center to have an eye care specialist perform surgery to correct plaintiff's right eye. Dkt. #1. Indeed, plaintiff alleges that he would have preferred to have been treated at the Albany Medical Center instead of the Harrison Center based upon his dislike of the Harrison Center. *Id*. In support of his motion for summary judgment, defendant Hopkins states that he does not recall ever receiving a request from plaintiff seeking defendant Hopkins' assistance in arranging for him to be treated at the Albany Medical Center. Dkt. #32, ¶ 4. In his declaration filed in support of his motion for summary judgment, defendant Hopkins further states, "[i]n summary, I do not recall Plaintiff requesting that I arrange for him to be treated at the Albany Medical Center. Even if he had, such a request would have been denied as unnecessary, as he was receiving appropriate medical care by Ophthalmologists at the Harrison Center." *Id*. at ¶ 5.

Finally, in support of his motion for summary judgment, defendant Wright maintains that he had no personal involvement or input with respect to the routine transfer of inmates from one facility to another and furthermore, was in no way involved in the decision to transfer plaintiff from Downstate to Elmira. Dkt. #31, ¶ 3. Moreover, defendant Wright believes that the first contact his office had with plaintiff was by reason of a letter sent by plaintiff to him and was received on March 2, 2005, several months after plaintiff was already transferred to Elmira. *Id*. Plaintiff's letter was

assigned to one of defendant Wright's staff members for investigation and response. *Id*. at ¶ 4. According to plaintiff's letter, plaintiff was receiving medical treatment for his eye condition at the Harrison Center, however, plaintiff preferred to be treated at the Albany Medical Center because of "a past negative experience he claims he had at the Harrison Center in 2001." *Id*. at ¶ 5. Regional Health Services Administrator for DOCS, Holly A. Collett, was assigned to investigate plaintiff's concerns articulated in his March 2, 2005 letter. *Id*. at ¶ 6. Following an investigation, Ms. Collett responded to plaintiff by letter dated March 7, 2005. *Id*. As summarized by defendant Wright in his declaration,

> Ms. Collett's investigation revealed that the Plaintiff was receiving medical treatment by Ophthalmologists at the Harrison Center, that he received contact lenses on February 14, 2005, and that his primary care physicians at Elmira had ordered additional follow-up care at the Harrison Center. Because the Plaintiff was complaining of a plan of medical treatment recommended by an Ophthalmologist at the Harrison Center (a plan to first attempt to improve his vision with contact lenses instead of immediately proceeding to surgery), he was encouraged to discuss his concerns with his medical providers.

*Id*. Finally, defendant Wright concludes that under the circumstances presented herein, where an investigation reveals that an inmate is clearly receiving adequate medical care and indicates that DOCS physicians are being diligent in scheduling follow-up appointments and following the recommended treatment plan, there is no medical reason to intervene and/or to second guess the medical decisions being made by the ophthalmologists at the Harrison Center. *Id*. at ¶ 7.

## DISCUSSION AND ANALYSIS

Defendants seek summary judgment on three separate and distinct grounds. First, defendants argue that plaintiff's claim for deliberate indifference to his serious medical needs must be dismissed because he failed to exhaust his administrative remedies. Second, defendants assert that plaintiff has not established the necessary elements of an Eighth Amendment claim. And third, defendants argue that plaintiff's claims must be dismissed for lack of personal involvement by each of the defendants. For the following reasons, this Court agrees with defendants that plaintiff's complaint must be dismissed because plaintiff failed to exhaust his administrative remedies, plaintiff cannot establish the necessary elements of an Eighth Amendment claim for deliberate indifference to his serious medical needs and none of the three defendants who have been served and appeared in this action were personally involved in the alleged violation of plaintiff's constitutionally protected rights.

## Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "In reaching this determination, the court must assess whether there are any material factual issues to be tried while resolving ambiguities and drawing reasonable inferences against the moving party, and

must give extra latitude to a *pro se* plaintiff." *Thomas v. Irvin*, 981 F. Supp. 794, 798 (W.D.N.Y. 1997) (internal citations omitted).

A fact is "material" only if it has some effect on the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see Catanzaro v. Weiden*, 140 F.3d 91, 93 (2d Cir. 1998). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see Bryant v. Maffucci*, 923 F.2d 979 (2d Cir.), *cert. denied*, 502 U.S. 849 (1991).

Once the moving party has met its burden of "demonstrating the absence of a genuine issue of material fact, the nonmoving party must come forward with enough evidence to support a jury verdict in its favor, and the motion will not be defeated merely upon a 'metaphysical doubt' concerning the facts, or on the basis of conjecture or surmise." *Bryant*, 923 F.2d at 982 (internal citations omitted). A party seeking to defeat a motion for summary judgment

> must do more than make broad factual allegations and invoke the appropriate statute. The [party] must also show, by affidavits or as otherwise provided in Rule 56 of the Federal Rules of Civil Procedure, that there are specific factual issues that can only be resolved at trial.

*Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995).

## Official Capacity Claims

Plaintiff commenced the instant action against Glenn S. Goord, Canfield, Wesley, William J. Hopkins and Lester N. Wright.  Dkt. #1.  The caption of plaintiff's complaint states that each of the named defendants are "being sued individually and in their official capacities."  *Id*.  Plaintiff's claims against the above-listed, defendants are asserted pursuant to 42 U.S.C. § 1983.  In order to state a claim pursuant to § 1983, a plaintiff must allege (1) that the challenged conduct was attributable at least in part to a person acting under color of state law, and (2) that such conduct deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States. *Dwares v. City of New York*, 985 F.2d 94,98 (2d Cir. 1993).

The Eleventh Amendment to the United States Constitution bars federal courts from exercising subject matter jurisdiction over claims against states absent their consent to such a suit or an express statutory waiver of immunity.  *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89,90-100 (1984).  It is well-settled that states are not "persons" under § 1983, and thus, Eleventh Amendment immunity is not abrogated by that statute.  *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71 (1989).  The Eleventh Amendment bar extends to agencies and officials sued in their official capacities.  *Kentucky v. Graham*, 473 U.S. 159, 166 (1985).  Accordingly, plaintiff's claims against the defendants in their official capacities are barred by the Eleventh Amendment and those claims are dismissed.  Based on the foregoing, the

balance of this Court's Decision and Order will address plaintiff's claims against the defendants in their individual capacities.

## Personal Involvement

It is well settled that the personal involvement of defendants in an alleged constitutional deprivation is a prerequisite to an award of damages under § 1983. *Gaston v. Coughlin*, 249 F.3d 156, 164 (2d Cir. 2001)*; Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995); *Al-Jundi v. Estate of Rockefeller*, 885 F.2d 1060,1065 (2d Cir. 1989). Personal involvement may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation; (2) was informed of the violation and failed to remedy the wrong; (3) created or permitted the continuation of a policy or custom under which unconstitutional practices occurred; (4) was grossly negligent in supervising subordinates who committed the wrongful acts; or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating unconstitutional acts were occurring. *Colon*, 58 F.3d at 873, *citing Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994).

In the instant case, DOCS Commissioner Glenn S. Goord, Deputy Superintendent for Administrative Services William J. Hopkins and Deputy Commissioner Chief Medical Officer Lester Wright were named by plaintiff as defendants. However, the complaint is devoid of any factual allegations to support a conclusion that any of the above-listed defendants had any involvement whatsoever in

the incidents alleged in the complaint. Absent any evidence of personal involvement in any of the five means enumerated above, under no circumstances can Commissioner Goord, Deputy Superintendent Hopkins or Deputy Commissioner Wright be held liable for damages pursuant to § 1983. Accordingly, the claims against Commissioner Goord, Deputy Superintendent Hopkins and Deputy Commissioner Wright fail as a matter of law.

**Deliberate Indifference to Serious Medical Needs**

In *Estelle v. Gamble*, the United States Supreme Court determined that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment" to the United States Constitution. 429 U.S. 97, 104 (1976). To establish an unconstitutional denial of medical care that rises to the level of an Eighth Amendment violation, a plaintiff (prisoner) must prove, beyond mere conclusory allegations, that the defendant acted with "deliberate indifference to [his] serious medical needs." *Estelle*, 429 U.S. at 104. More specifically, the prisoner must demonstrate both that the alleged deprivation is, in objective terms, "sufficiently serious," and that, subjectively, the defendant is acting with a "sufficiently culpable state of mind." *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994), *cert. denied*, 513 U.S. 1154 (1995). Both the objective and subjective components must be satisfied in order for a plaintiff to prevail on his claim. *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996).

**Objective Component**

Under the objective component, in assessing whether a medical condition is "sufficiently serious," the Court considers all relevant facts and circumstances, including whether a reasonable doctor or patient would consider the injury worthy of treatment; the impact of the ailment upon an individual's daily activities; and, the severity and persistence of pain. *See Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998). A serious medical condition exists where the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain. *Id.* Indeed, the Second Circuit has held that the alleged deprivation must be "sufficiently serious, in the sense that a condition of urgency, one that may produce death, degeneration, or extreme pain exists." *Hemmings v. Gorczyk*, 134 F.3d 104, 108 (2d Cir. 1998). "[I]n most cases, the actual medical consequences that flow from the alleged denial of care will be highly relevant to the question of whether the denial of treatment subjected the prisoner to a significant risk of serious harm." *Smith v. Carpenter*, 316 F.3d 178, 187 (2d Cir. 2003).

The types of conditions which have been held to meet the constitutional standard of serious medical need include: the failure to treat a painful and disfiguring facial keloid, *Brock v. Wright*, 315 F.3d 158, 160 (2d Cir. 2003); refusal to treat a cavity at risk of "acute infection[ ], debilitating pain and tooth loss" unless prisoner consented to extraction of another diseased tooth, *Harrison v. Barkley*, 219 F.3d 132, 136-37 (2d Cir. 2000); untreated dental problems that resulted in chronic pain for a period of six

months resulting in tooth degeneration, *Chance*, 143 F.3d. at 702; failure to treat a ruptured Achilles tendon which resulted in swelling and pain, *Hemmings*, 134 F.3d at 106-07; confiscation of prescription eyeglasses necessary to correct serious vision problem and subsequent denial of medical treatment resulting in loss of vision in one eye, *Koehl v. Dalsheim*, 85 F.3d 86, 87-88 (2d Cir. 1996); failure to remove broken hip pins from prisoner's hip for over three years despite prisoner's complaint of persistent pain, *Hathaway*, 37 F.3d at 64-65; and, loss of an ear where doctor threw away prisoner's ear and stitched up the stump, *Williams v. Vincent*, 508 F.2d 541, 543 (2d Cir. 1974).

### Subjective Component

The subjective component for the establishment of a claim of deliberate indifference to a serious medical need requires that the plaintiff establish that the defendant acted with a "sufficiently culpable state of mind" so as to violate the Eighth Amendment's cruel and unusual punishment clause. *Wilson v. Seiter*, 501 U.S. 294, 298 (1991). "[A] prison official does not act in a deliberately indifferent manner unless that official 'knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Hathaway*, 37 F.3d at 66, *quoting Farmer v. Brennan*, 511 U.S. 825, 837 (1994). In *Estelle*, the Supreme Court ruled that deliberate indifference may manifest itself in a doctor's refusal to administer needed treatment, a prison guard's intentional denial or

delay in granting an inmate access to medical care, or intentional interference with prescribed treatment. *Estelle*, 429 U.S. at 104-05.

"The subjective element of deliberate indifference 'entails something more than mere negligence . . . [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.'" *Hathaway*, 99 F.3d at 553, *citing Farmer v. Brennan*, 511 U.S. 825 (1994); *see also Hernandez v. Keane*, 341 F.3d 137, 144 (2d Cir. 2003), *cert. denied*, 543 U.S. 1093 (2005). The Supreme Court further stated in *Estelle* that, "an inadvertent failure to provide adequate medical care cannot be said to constitute 'an unnecessary and wanton infliction of pain' or to be 'repugnant to the conscience of mankind.'" *Estelle*, 429 U.S. at 105-06. Thus, the Supreme Court added,

> [a] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.

*Id*. at 106; *see also Chance*, 143 F.3d at 703 (stating "[s]o long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation"). Indeed, "it is well-established that mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different

treatment does not give rise to an Eighth Amendment violation." *Chance*, 143 F.3d at 703.

Here, plaintiff claims that defendants, Goord, Hopkins and Wright, were deliberately indifferent to his serious medical needs in violation of his rights pursuant to the Eighth Amendment to the United States Constitution. Indeed, plaintiff's chief complaint is that he did not receive, at the time and facility he thought appropriate, corrective eye surgery to his right eye. Plaintiff's claim that he did not receive proper medical treatment is belied by the extensive notations in his medical records (annexed to the declaration of Dr. John Alves and filed under seal) reflecting treatment dates and evaluations, including corrective eye surgery performed by Dr. Petrela at the Harrison Center on June 28, 2006. Indeed, annexed to the Declaration of Dr. John Alves, a medical doctor employed by DOCS at Elmira, are approximately 200 pages of medical records detailing plaintiff's treatment for the period June 2004 to August 2006.

In sharp contrast to plaintiff's allegation that defendants were deliberately indifferent to his serious medical needs, defendants submit evidence in affidavit form which establishes that from the time he was received at Downstate and continuing through his placement and housing at Elmira, plaintiff received extensive care following his diagnosis of refractory error and 20/200 vision in his right eye, as well as a subsequent diagnosis of a dislocation of his intraocular lens ("IOL"). Specifically, plaintiff received an initial eye evaluation at Downstate, followed by an immediate referral to an eye specialist while he was housed at Downstate. Following his transfer

to Elmira, plaintiff was again evaluated and referred to a specialist at the Harrison Center, where it was recommended that plaintiff be fitted for corrective contact lenses. Although plaintiff's vision improved significantly with the corrective contact lenses, plaintiff was intolerant of the corrective contact lenses and as a result the Harrison Center recommended a care plan, including repositioning of his IOL in his right eye and a capsulatomy. Although plaintiff's original August 10, 2005 surgery date was cancelled, and his subsequent January 26, 2006 surgery was postponed due to an "abnormal electrocardiogram," plaintiff's surgery did take place on June 28, 2006, after plaintiff commenced the instant action.

Where, as here, the prisoner has received medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgment. Rather, "[p]rison officials have broad discretion in determining the nature and character of medical treatment afforded to inmates [and] courts have repeatedly held that a prisoner does not have the right to the treatment of his choice." *Ross v. Kelly*, 784 F.Supp. 35, 44-45 (W.D.N.Y.), *aff'd*, 970 F.2d 896 (2d Cir.1992) (internal citations omitted). Plaintiff's claim amounts to nothing more than a disagreement with the treatment plan originally formulated while he was being housed at Downstate and later revised while plaintiff was housed at Elmira and receiving treatment at the Harrison Center and the overall timing and location of the treatment he received. Without more, plaintiff's disagreement with the medical treatment he received does not rise to the level of a violation of his Eighth Amendment rights. Accordingly,

plaintiff has failed to establish that an issue of fact exists requiring denial of summary judgment in favor of defendants.

**Exhaustion of Administrative Remedies**

The PLRA states: "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). In *Porter v. Nussle*, 534 U.S. 516 (2002), the Supreme Court held that exhaustion of administrative remedies in 1997(e) cases is mandatory[3] and should be applied broadly. *Id.* at 524. The *Nussle* Court reasoned that requiring inmates to follow the grievance process would ultimately "reduce the quantity and improve the quality of prisoner suits;" filter out frivolous claims; and for those cases that eventually come to court, the administrative record could potentially clarify the legal issues. *Id.* at 524-25. "Even when the prisoner seeks relief not available in grievance proceedings" – such as monetary damages – "exhaustion is a prerequisite to suit." *Id.* at 524, *citing Booth v. Churner*, 532 U.S. 731, 741 (2001). Thus, the "PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Id.* at 532.

---

[3] Although mandatory, administrative exhaustion is an affirmative defense rather than a jurisdictional predicate. *Richardson v. Goord*, 347 F.3d 431 (2d Cir. 2003); *Jenkins v. Haubert*, 179 F.3d 19, 28-29 (2d Cir. 1999).

The New York State Department of Correctional Services employs a three-step Inmate Grievance Program that requires an inmate to: (1) file a grievance with the Inmate Grievance Review Committee as set forth in 7 N.Y.C.R.R. § 701.7(a)(1); (2) appeal to the superintendent within four working days of receiving the Inmate Grievance Resolution Committee's adverse written response as set forth in 7 N.Y.C.R.R. § 701.7(b)(1); and appeal to the Central Office Review Committee in Albany, New York within four working days of receipt of the superintendent's adverse written response, as set forth in 7 N.Y.C.R.R. § 701.7(c)(1). *Abney v. McGinnis*, 380 F.3d 663 (2d Cir. 2004).

In assessing what constitutes exhaustion of administrative remedies, the Court of Appeals for the Second Circuit determined that,

> a three-part inquiry is appropriate in cases where a prisoner plaintiff plausibly seeks to counter defendants' contention that the prisoner has failed to exhaust available administrative remedies as required by the PLRA, 42 U.S.C. § 1997e(a). Depending on the inmate's explanation for the alleged failure to exhaust, the court must ask whether administrative remedies were in fact "available" to the prisoner. *Abney v. McGinnis*, 380 F.3d 663 . . . . The Court should also inquire as to whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, *Johnson v. Testman*, 380 F.3d 691 . . . ., or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense, *Ziemba*,[4] 366 F.3d at 163. If the court finds that administrative remedies were available to the plaintiff, and that the defendants are not estopped and have not forfeited their non-exhaustion defense, but that plaintiff

---

[4] *Ziemba v. Wezner*, 366 F.3d 161 (2d Cir. 2004).

nevertheless did not exhaust available remedies, the court
should consider whether "special circumstances" have been
plausibly alleged that justify "the prisoner's failure to comply
with administrative procedural requirements." *Giano v.
Goord*, 380 F.3d 670. . . .

*Hemphill v. New York,* 380 F.3d 680, 686  (2d Cir. 2004).


        The Second Circuit has held, however, that although administrative

remedies may have been available and the government has neither waived nor is

estopped from asserting the affirmative defense of non-exhaustion, the prisoner's

failure to comply with the administrative procedural requirements may otherwise be

justified.  *Id*. at 689 (internal citations omitted).  For example, in *Giano v. Goord*, 380

F.3d 670 (2d Cir. 2004), the "special circumstances" justifying plaintiff's failure to

exhaust consisted of his reasonable interpretation of DOCS regulations.  The plaintiffs

in both *Giano* and *Hemphill* claimed that they attempted to exhaust their administrative

remedies by writing directly to the Superintendent and that such writing comported with

DOCS procedural rules or, in the alternative, reflected a reasonable interpretation of the

regulations.  Following its holding in *Giano* that reliance on a reasonable interpretation

of prison grievance regulations may justify an inmate's failure to follow the procedural

rules to the letter, the Second Circuit in *Hemphill* remanded the matter to the district

court for consideration, in light of *Giano*, of this possible justification for Hemphill's

failure to follow normal grievance procedures.  *Hemphill*, 308 F.3d at 690.  Additionally,

the Second Circuit in *Hemphill* further stated that the district court should determine

whether some defendants were estopped from asserting non-exhaustion as an

affirmative defense insofar as threats made may have justified Hemphill's failure to follow proper grievance procedures. *Id*.

In the instant case, defendants Goord, Hopkins and Wright argue that they are entitled to summary judgment with respect to plaintiff's claim, because he failed to exhaust his administrative remedies. Indeed, based on the record before the Court, including plaintiff's letter to this Court dated March 3, 2008, wherein plaintiff admitted that he failed to exhaust his administrative remedies, defendants maintain that there is no evidence to suggest that the plaintiff ever properly submitted a grievance, much less exhausted his administrative remedies. In support of defendants' motion for summary judgment, Elmira Inmate Grievance Program Supervisor Marty Titus submitted a declaration stating that a search for any inmate grievance filed by plaintiff for the period October 28, 2004 to May 11, 2007 revealed only two grievances filed in April 2007, long after plaintiff commenced this action and plaintiff's June 28, 2006 eye surgery took place. Dkt. #33, ¶ 3. In fact, Supervisor Titus confirms that neither of the two grievances filed by plaintiff in April 2007 pertain in any way to inadequate medical care. *Id*. With respect to the documents plaintiff attached to his complaint which plaintiff characterizes as grievances, Supervisor Titus stated in his declaration that the first "grievance" dated March 18, 2005 was not received by the Inmate Grievance Office and as a result, was not considered filed under Directive 4040. Plaintiff's next "grievance" dated March 31, 2005 was addressed to "E.G.P. Supervisor" and Supervisor Titus stated that he was "unsure to what that refers." Dkt. #33, ¶ 4. Accordingly, Supervisor Titus concludes that assuming *arguendo* that plaintiff did file

grievances and did not receive a response, a non-response is considered a denial and plaintiff is obligated to appeal to the Superintendent under Directive 4040 in order to exhaust his administrative remedies. *Id*. However, had plaintiff appealed to the Superintendent, such an appeal would be included in plaintiff's grievance file, and there is no such letter in his file. *Id*. Accordingly, based upon the record before it, this Court concludes that defendants have again demonstrated their entitlement to judgment as a matter of law with respect to plaintiff's claim of deliberate indifference to his serious medical needs on the grounds that plaintiff failed to exhaust his administrative remedies.

## CONCLUSION

For the foregoing reasons, defendants' Motion for Summary Judgment (Dkt. #26) is granted. The Court hereby certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this Order would not be taken in good faith, and leave to appeal to the Court of Appeals as a poor person is denied. *Coppedge v. United States*, 369 U.S. 438 (1962). Further requests to proceed on appeal as a poor person should be directed, on motion, to the United States Court of Appeals for the Second Circuit, in accordance with Rule 24 of the Federal Rules of Appellate Procedure.

**SO ORDERED.**

DATED:     Buffalo, New York
           May 17, 2010

                                        *s/ H. Kenneth Schroeder, Jr.*
                                        **H. KENNETH SCHROEDER, JR.**
                                        **United States Magistrate Judge**